# EXHIBIT A

ADMINISTRATIVE SERVICES CONTRACT (ASC) - MONTHLY WIRE PROGRAM

between

BLUE CROSS AND BLUE SHIELD OF MICHIGAN

and

Dykema Excavators, Inc.

THIS CONTRACT, effective as of the June 1, 2003, is between BLUE CROSS AND BLUE SHIELD OF MICHIGAN (BCBSM), a Michigan non-profit Corporation, whose address is 600 Lafayette East, Detroit, Michigan 48226, and Dykema Excavators, Inc(Group), whose address is 1730 3 Mile NE, Grand Rapids, Michigan 49504.

The intent of this Contract is to establish the criteria for eligibility of individuals for health care Coverage provided by the Group; to describe health care Coverage available to such individuals through the Group; to set forth the general responsibilities of BCBSM and the Group; and to set forth the financial responsibilities of the Group for health care Coverage administered by BCBSM under this Contract.

THEREFORE, in consideration of their mutual promises, BCBSM and the Group agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Contract, defined terms are:

A. "Amounts Billed" means the amount the Group owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

B. "Contract" means this Contract, as may be amended from time to time, and any Schedules, Exhibits and Addenda attached hereto.

C. "Contract Year" means the Initial Term of this Contract and each Renewal Term. In the event of termination other than at completion of the Contract Year, a Contract Year means that period from the Effective Date or the most recent Renewal Date through the termination date.

D. "Coverage(s)" means the health care benefits selected by the Group on Schedule C - Coverage(s).

E. Disputed Claim(s)" means Amounts Billed used to determine the Group's liability which the Group believes should not be so used.

F. "Effective Date" means June 1, 2003.

G. "Employees" means the following who are eligible and enrolled for Coverage: (i) employees as designated by the Group in Schedule B, Group Enrollment Profile; (ii) if

1

30009946544

applicable, retirees and their surviving spouses as designated by the Group in the Retiree Agreement; and (iii) COBRA beneficiaries.

H. "Enrollees" means Employees and dependents of Employees who are eligible and enrolled for Coverage.

I. "Estimated Outstanding Liability (EOL)" means an estimate of the Group's liability for the amount of Incurred But Not Reported Claims (IBNR) which will be paid by BCBSM after the date of termination, and which is the Group's obligation to pay pursuant to the provisions of this Contract.

J. "IBNR Claims" means Enrollees' claims which are incurred pursuant to this Contract but have not been reported as paid to the Group and for which Amounts Billed will remain the Group's responsibility pursuant to this Contract.

K. "Initial Term" means the first Contract Year commencing on the Effective Date.

L. "Provider Network Fee" means the amount allocated to the Group for the expenses incurred by BCBSM in the establishment, management and maintenance of its participating hospital, physician and other health care provider networks.

M. "Quarterly Payment Period" means each three (3) month period, commencing on the Effective Date and continuing during the Term(s) of this Contract and, for purposes of Article IV.F. only, also includes the first three (3) months following termination.

N. "Renewal Date" means the first day of each Renewal Term stated in Schedule A.

O. "Renewal Term" means a period commencing on the first day following the end of the Initial Term and of each subsequent Contract Year as stated in Schedule A.

P. "Term(s) of this Contract" means the period(s) beginning with the Effective Date and continuing thereafter until terminated as provided in Article VII.

## ARTICLE II
## GENERAL RESPONSIBILITIES

A. Standards.

BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between this Contract and such standard operating procedures, this Contract controls.

The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims. BCBSM shall have no responsibility for: the failure of the Group to meet its financial obligations; to advise Enrollees of the benefits provided; and to advise Enrollees that Coverage has been terminated for any reason, including the failure to make any payments when due.

If the Group's health care program is subject to the Employee Retirement Income Security Act of 1974 (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, the Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

B. Enrollment.

The Group will, prior to the Effective Date of this Contract, notify BCBSM of all Enrollees eligible and enrolled for Coverage and will, thereafter, promptly notify BCBSM of all changes in eligibility/enrollment according to procedures established by BCBSM. BCBSM will not have any obligation as to changes in eligibility/enrollment prior to proper notification. BCBSM will continue to process and the Group will continue to reimburse BCBSM for claims of Enrollees which were incurred through the last day of the month in which BCBSM had at least five (5) business days notice of Enrollee ineligibility.

However, if Group employs an automated means, acceptable to BCBSM, for providing enrollment and eligibility information to BCBSM, the changes will be effective on the first day following the day such changes have been properly reflected on the data base used by BCBSM to process Enrollees' claims.

C. Claims.

BCBSM will process and pay, and the Group will reimburse BCBSM for all Amounts Billed related to Enrollees' claims incurred during the Term(s) of this Contract.

Following termination of Enrollee eligibility, or following termination of this Contract, as set forth in Article VII.B.1., BCBSM will continue to process and pay Enrollees' claims which are incurred during the Term(s) of this Contract; and following termination for Nonpayment or Partial Payment, as set forth in Article VII.B.2., or in the event of Enrollee ineligibility, BCBSM may, in its discretion, continue to process and appropriately pay IBNR claims and the Group will reimburse BCBSM for any claims so paid.

Notwithstanding any other Contract provisions, BCBSM will have no obligation whatsoever as to claims which are incurred following termination of this Contract.

D. Dispute Resolution.

The Group will, within sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and will, upon request, execute any documents required for collection of amounts that third parties owe. BCBSM will investigate and within a reasonable time, respond to such Claim(s). Additionally, BCBSM will,

1. following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

2. following BCBSM's determination that any other disputed amount is not the Group's liability or that an amount shown on a claims listing and invoice is incorrect,

3

credit the recovered or corrected amount, reduced by any Stop Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, as administrator under this Contract, is subrogated to all rights of the Group/Enrollees relating to Disputed Claim(s) but is not obligated to institute or become involved in any litigation concerning such Claim(s).

E.  Group Audits.

The Group, at its own expense, shall have the right to audit Enrollee claims incurred under this Contract; however, audits will not occur more frequently than once every twelve (12) months and will not include claims from previously audited periods or claims paid prior to the last twenty-four (24) months. Both parties acknowledge that claims with incurred dates over two (2) years old may be more costly to retrieve and that it may not be possible to recover over-payments for these claims; however, BCBSM will use best efforts to retrieve such claims.

All audits will be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent group-initiated audits. Therefore after notice from the Group requesting an audit, BCBSM will have 60 to 90 days, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes will not exceed 200 claims and will be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%). The Group will reimburse BCBSM for claims documentation in excess of 200 claims at $20 per randomly selected claim and $50 per focused or electronically selected claim. However, reimbursement will be waived for any agreed-upon error claims.

Following the on-site activity and prior to disclosing the audit findings to the Group, the auditor will meet with BCBSM Management and present the audit findings. BCBSM, depending upon the scope of the audit, will be given a reasonable period of time to respond to the findings and provide additional documentation to the auditor before the auditor discloses the audit findings to the Group.

BCBSM shall have no obligation to make any payments to the Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable. No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors. An audit error will not be assessed if the claim payment is consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Group Instructions agreed to by BCBSM.

Prior to any audit, the Group and BCBSM must mutually agree upon any independent third party auditor that the Group wishes to perform the audit. Additionally, prior to audit, the Group and any third party auditor will sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for: the scope of the audit; the costs for which BCBSM is to be reimbursed by the Group; the protection of confidential and proprietary information belonging to BCBSM and of any patient

4

specific information; and the indemnification and hold harmless of BCBSM from any claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider arising out of any breach by the Group and/or its auditor.

F. Disclosure.

The Group will disclose to Employees: the services being provided by BCBSM; the fact that BCBSM does not insure the Coverage provided to Enrollees; if BCBSM certificates are used for the purpose of selecting the Coverage(s) to be provided by the Group, the fact that Enrollees are not covered under these BCBSM certificates and that BCBSM assumes no liability for the Coverage(s) so selected; the party liable for benefits; the party liable for future changes in benefits; the fact that information concerning Enrollees may be reviewed by parties other than BCBSM; and any other matters mandated by law. Also, the Group will, prior to issuance to Enrollees, submit such disclosure materials as well as all Enrollee materials regarding health Coverage to BCBSM.

G. Statutory and Contractual Interest.

BCBSM's enabling legislation and participating provider contracts may require payment of interest to Enrollees and providers. Any interest required to be paid to Enrollees will be made in addition to and at the time of late payment of a satisfactory claim and to providers pursuant to contract.

The Group shall reimburse BCBSM for any interest paid if BCBSM did not pay the claim(s) due to: BCBSM's exercise of its contractual right to cease processing claims; the failure of the Group to timely notify BCBSM of Enrollees' eligibility; or specific instructions from the Group not to pay claims. BCBSM shall pay any interest otherwise incurred.

H. Confidentiality.

To the extent permitted by State and Federal law, the Group may have access to plan records and data and both BCBSM and Group shall strictly adhere to all such laws regarding confidentiality of data relating to specific Enrollees; and, unless first obtaining the prior written consent of an Enrollee, shall not use any Enrollee's specific data except for claims adjudication and verification purposes as set forth in 1980 PA 350.

The Group may have access to proprietary information of BCBSM; however, in obtaining such access, the Group agrees that it will hold all such proprietary information confidential and shall use such information only for purposes related to Enrollees' claims administered by BCBSM pursuant to this Contract and, further agrees, that no such proprietary information shall be released to any third party without such party having first executed an indemnification and confidentiality agreement in a form acceptable to BCBSM. In releasing any proprietary information, BCBSM does not waive any protection it may have regarding trade secrets and other proprietary information pursuant to either the State or Federal Freedom of Information Acts.

Enrollee specific data will not be released to any third party unless a confidentiality and indemnification agreement in favor of, and acceptable to BCBSM has been

executed, which shall limit the use of such data as permitted by State and Federal law.

Nothing in the Contract, however, will prevent the Group from utilizing overall claims experience and other claims information of a non-specific Enrollee nature for comparative rate quotations.

I. Medicare Secondary Payer.

The Group will be responsible for determining whether any person should be covered under this Contract or under the Medicare Program and to identify to BCBSM all persons subject to the Medicare Secondary Payer statute and regulations so that BCBSM may properly pay any Enrollee claim as primary or secondary under the Medicare Program. The Group agrees to indemnify and hold harmless BCBSM for any claims, demands, judgments, penalties or other liabilities arising out of the Group's failure to provide timely and accurate information in order for BCBSM to make any such determination.

J. Certification of Creditable Coverage.

Group____, or BCBSM _CZ_, by its initials, agrees to assume all responsibility for issuing automatic certificates of creditable coverage to terminated participants and dependents as required by the Health Insurance Portability and Accountability Act of 1996 and regulations, and further agrees to respond to any requests for such certificates and related inquiries. The Group will be responsible for notifying BCBSM of all terminations of coverage as set forth in Article II.B. Also, if applicable, the Group will retain responsibility for issuing certificates of coverage to persons entitled to elect COBRA no later than when the Group provides the COBRA notice.

## ARTICLE III
## FINANCIAL RESPONSIBILITIES

A. General Obligations.

The Group will immediately assume: all risks; all financial obligations, including but not limited to Amounts Billed, court costs, and attorney's fees; and all other liabilities BCBSM may assume or which might otherwise attach with respect to processing Coverage pursuant to this Contract. The Group will make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities. Group responsibility will not, however, include amounts resulting directly from any negligent processing/payment of claims by BCBSM.

B. Specific Obligations.

The Group will, for each Contract Year, pay BCBSM the total of the following amounts:

1. Amounts Billed during the current Contract Year.

2. The hospital prepayment reflecting the amount BCBSM determines is necessary for its funding of the prospective hospital reimbursement.

6

30009946544

3. The actual administrative charge.

4. The group conversion fee.

5. Any late payment charge.

6. Any statutory and/or contractual interest.

7. Stop Loss premiums, if applicable.

8. Cost containment program fee, if applicable.

9. Any other amounts which are the Group's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

## ARTICLE IV
## PAYMENT OF FINANCIAL RESPONSIBILITIES

A. **Timely Payment and Remedies.**

All amounts owed pursuant to this Contract will be paid timely. All amounts shown on the Schedule A will be paid by the Group by the monthly payment day/date. Any separately invoiced amounts will be paid within fifteen (15) days of invoice or settlement receipt. BCBSM will pay any amounts due within fifteen (15) days of the settlement.

BCBSM will promptly notify the Group of any overdue payments. Late payment fees will be assessed as follows:

- If any amount is more than one (1) business day overdue, BCBSM will assess a two (2%) percent late payment fee.

- If any overdue amount remains outstanding into the next month, an additional late payment fee will be assessed for such month and each succeeding month for which such amount remains outstanding.

BCBSM will review the Group's payments to determine if any late payments are to be assessed. Payments received will first be applied to any amounts overdue. BCBSM may cease processing and paying Enrollees' claims if any payment is ten (10) days overdue retroactive to the last date for which full payment was made.

The payment day, the payment dates and estimated amounts owed for the first Quarterly Payment Period, the statutory and contractual interest rate, and the late

7

30000046544

payment charge are stated in Schedule A. However, notwithstanding the late payment charge stated, such charge will not exceed the maximum permitted by law.

B. Scheduled Payments

1. Schedule A - Initial Term. The scheduled payments to be paid by the Group during the Initial Term (first Contract Year) are listed in Schedule A, which shows the following:

    (1) administrative fee per Employee,

    (2) Stop-Loss premiums per Employee, if applicable,

    (3) estimated number of Employees,

    (4) covered lines of business, including those with Stop Loss if applicable,

    (5) the hospital prepayment necessary to maintain the prospective hospital reimbursement funding,

    (6) estimated monthly payments, including Stop Loss premiums if applicable, and

    (7) the schedule and method of payment.

2. Schedule A - Renewal Term. Annually, approximately thirty (30) days before the end of each Contract Year, BCBSM will present the Group with a revised Schedule A.

3. Estimated Monthly Payments. During the first two Quarterly Payment Periods, the Group will, as stated in Schedule A - Initial Term, monthly pay:

    (1) the pro rata cost of estimated Amounts Billed for the Quarterly Payment Period;

    (2) the estimated administrative charge and, if applicable, of Stop Loss premiums for the Contract Year;

    (3) the amount BCBSM determines necessary to maintain the prospective hospital reimbursement funding for the Quarterly Payment Period; and

    (4) any other amounts owed by the Group pursuant to this Contract.

    Thereafter, BCBSM will, approximately thirty (30) days before each Quarterly Payment Period, notify the Group of any adjustments in the above amounts to be paid during the next Period. The estimated amounts owed relating to claims for each Quarterly Payment Period are based on the total of Amounts Billed during the prior available twelve (12) months, adjusted for costs and utilization.

4. Claims Listings. The Amounts Billed for each month are shown on monthly claims listings provided on approximately the twentieth (20th) of each month by line of business as follows:

30009946544

(1) Facility claims listings showing charges by claim and in total, and the total Amounts Billed.

(2) Claims listings for each other line of business showing Amounts Billed by claim and in total.

Each listing will also show any credits for Disputed Claim(s) which have been resolved and any other adjustments.

C. Quarterly Settlements.

In conjunction with the payment development for the next Quarterly Payment Period, BCBSM will, approximately sixty (60) days after the close of each Quarterly Payment Period, provide a detailed settlement showing Amounts Billed to and owed by the Group during the prior available Quarter including any surplus or deficit amounts.

BCBSM also will so provide a settlement of the estimated and actual administrative charges based on the actual number of Employees. Any deficit or surplus resulting from this settlement will be reflected in the next Quarterly Payment Period. Stop Loss premiums, if applicable, will be settled in the same manner.

D. Changes in Enrollment or Coverages.

In the event of a more than ten (10%) percent change in Enrollment and/or a change in Coverages, the monthly administrative fee, estimated number of employees and, if applicable, Stop Loss premiums may be revised to reflect such changes in Enrollment and/or Coverages. Any revisions will be effective beginning with the next Quarterly Payment Period following thirty (30) day notification by BCBSM to the Group.

E. Hospital Settlement Adjustments.

Reconciliations of the original and settled hospital reimbursements are made periodically by BCBSM for its participating hospitals. Any hospital settlement adjustments for the Group will be based upon reconciliations made for those hospitals in which services were received by Enrollees and reflected in Amounts Billed. Depending on whether these reconciliations result in a savings or deficit, BCBSM may make either a credit or charge to a special hospital savings account maintained for the Group. If for a given calendar year, any cumulative credits and charges made to this account reflect a positive balance, one half of such cumulative balance, net of any applicable Aggregate Stop Loss settlement payments and/or any other amounts owed BCBSM, plus interest will be refunded to the Group. Only the positive cumulative balance of this special account, if any, will be reflected in any calculations of the Estimated Outstanding Liability (EOL) or in the final settlement for the last Contract Year under Article IV.F. below.

In the event the cumulative balance to this account reflects a negative balance, such balance will not be considered as an amount owed by the Group; however, any negative balance will be charged interest and netted against any positive facility

30009946544

settlements. Also, if this Contract is terminated and as part of the settlement for the last Contract Year under Article IV.F.3., any provider refunds or settlements due the Group will be charged first against any such negative balance. Any excess of such refunds or settlements will be credited to the Group.

F. **Post Termination.**

Notwithstanding anything contained herein to the contrary, the Group's obligation to pay amounts incurred under this Contract will survive termination, and the Group will continue to timely pay all amounts owed. Because of the special arrangements and agreements for payment of services between BCBSM and its participating health care providers, all Enrollee claims incurred under this Contract will be processed by BCBSM pursuant to the terms and conditions herein and the Group agrees that it will have no right to have any such claims processed by a replacement carrier or administrator.

1. Monthly Wire Payments. For the first three (3) months following termination the Group will continue to make monthly wire payments in the same manner as, and as determined before termination; however, if the termination occurs before a settlement has been made for the last Quarterly Payment Period, the monthly amounts then being made will continue to be made during the first three (3) months following termination unless BCBSM determines a different amount is to be so paid.

   In addition, the Group will, for each such first two (2) months only, continue to pay the administrative fee in the same manner as determined prior to termination.

2. Estimated Outstanding Liability. Within ninety (90) days following termination, BCBSM will prepare a settlement in the form of a quarterly settlement, for the period from the last quarterly settlement through the date of termination, and make an initial calculation of the Estimated Outstanding Liability (EOL), which will take into account the monthly payments during the first three (3) months following termination and advise the Group of its continuing liability for the EOL so estimated.

   If the total amount of the monthly payments made during the first three (3) month period following termination exceed the Amounts Billed during the period, BCBSM will pay the Group interest on the average monthly balance of any excess at the then rate for short term government treasury bonds (STIGB). The total amount of any excess will be included as gains in the settlement for the last contract year as provided in Subsection F. 3. below.

3. Settlement - Last Contract Year. Within ninety (90) days after the first three (3) month period following termination, BCBSM will prepare a total settlement for the last Contract Year and such three (3) month period which will include: if applicable, a final settlement for Stop Loss Premium(s) and Aggregate Stop Loss Attachment Point; a final settlement of administrative fees, except that the settlement for the first two (2) months following termination will be based on the average monthly number of Employees during the last Contract Year; the amount of any gain and losses for Amounts Billed during the first three (3) months following termination; the hospital prepayment; the positive balance in the hospital savings account, if any, and other credits due the

Group, net of any amounts owed by the Group; and the amount of any STIGB Interest credited to the Group. If the summation of the above shows a loss for the Group, the Group shall pay that amount within thirty (30) days net of, if applicable, any surplus as recalculated below and, if not so paid, shall be subject to late payment charges.

The EOL will also be recalculated at this time, which will take into account gains, if any, resulting from the total settlement as determined above. If the recalculation shows a deficit over any funds then held by BCBSM, the Group will be advised of the amount of the deficit and of its continuing obligation for payment of the EOL. If the recalculation shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Group by BCBSM within thirty (30) days net of, if applicable, any losses resulting from the total settlement as determined above.

BCBSM will first charge any Amounts Billed against any funds then held by it and, after exhausted, will monthly invoice the Group for Amounts Billed. All monthly invoices will be paid within thirty (30) days of invoice or be subject to late payment charges. BCBSM will continue to pay the Group STIGB Interest on any positive balance as set forth in Subsection F. 2. above.

4. <u>Interim Calculations and Notifications of EOL.</u> Within sixty (60) days after each of the six (6) month, twelve (12) month and eighteen month periods following termination, BCBSM will prepare settlements for each period, also in the form of quarterly settlements, and make new calculations of the EOL. The purpose of these interim EOL calculations is so that the Group will be aware of any potential liability for Amounts Billed and plan accordingly.

If any interim calculation shows a deficit over any funds then held by BCBSM, the Group will be so advised and of its continuing obligation for payment. If any calculation shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Group by BCBSM within thirty (30) days. Any Amounts Billed will first be charged against any funds then held by BCBSM and, after exhausted, BCBSM will monthly invoice the Group for Amounts Billed.

BCBSM will continue to pay the Group STIGB interest on any positive balance as set forth in Subsection F. 2. above, and any monthly invoices will be subject to late payment charges if not paid within thirty (30) days.

5. <u>Final Calculation and Notification of EOL.</u> Within ninety (90) days after the twenty-four month period following termination, BCBSM will prepare a settlement, also in the form of a quarterly settlement, make a final calculation of the EOL and advise the Group of its continuing liability for payment. Any funds then held by BCBSM will be returned to the Group within thirty (30) days.

6. <u>Subsequent Claims.</u> Any claims received thereafter will be billed to the Group and payable within thirty (30) days of receipt.

11

20009946544

G.  Conversion to Underwritten Group.

The provisions of Sections F., 1. through 6., inclusive shall also apply if the Group converts from a self-funded group to a BCBSM underwritten group. Any EOL so calculated shall remain the obligation of the Group, and shall be timely paid as set forth in such Sections in addition to any premium payments as a BCBSM underwritten group.

## ARTICLE V
## GROUP ACKNOWLEDGMENT OF BCBSM
## SERVICE MARK LICENSEE STATUS

This Contract is between the Group and BCBSM, an independent corporation licensed by the Blue Cross and Blue Shield Association (BCBSA) to use the Blue Cross and Blue Shield names and service marks in Michigan. However, BCBSM is not an agent of BCBSA and, by entering into this Contract, the Group agrees that it made this Contract based solely only on its relationship with BCBSM or its agents. Group further agrees that BCBSA is not a party to, nor has any obligations under this Contract, and that no obligations of BCBSA are created or implied by this language.

## ARTICLE VI
## BLUECARD PROGRAM SERVICES
## PROCESSED AND PAID BY OTHER BCBS PLANS

A.  Application.

The BlueCard Program applies only where an Enrollee obtains Out-of-Area Services (other than in Michigan) from a health care provider that has a participating agreement with another Blue Cross and/or Blue Shield Plan (the "Host Plan") and the Group is to receive the benefit of the negotiated payment rates and resulting savings for the services provided to the Enrollee. For these services, the Enrollees' claims will be processed and paid by the Host Plan, which in turn will bill BCBSM for the negotiated rate plus an access fee, if any.

B.  Access Fees.

If an access fee is charged by the Host Plan, the amount of the fee may be up to (10) percent of the negotiated savings obtained by the Host Plan from its providers but not to exceed Two Thousand ($2,000) Dollars. Access fees will be charged only if the Host Plan's arrangements with its participating providers prohibit billing the Enrollee for amounts in excess of the negotiated rate. However, providers may bill for deductibles and/or copayments.

C.  Payment of Access Fees.

If BCBSM is charged an access fee, the amount of the fee will be charged to the Group as a claims expense because it represent payments for Enrollee claims which BCBSM was either unable to avoid paying or, in the case of a credit, was able to avoid paying. All access fees paid will be included in Amounts Billed along with the amount paid to the provider. If BCBSM receives an access fee credit, it will be deducted from Amounts Billed.

D. Enrollee Copayments.

Upon receipt of a claim from the Host Plan under the BlueCard Program, BCBSM will advise the Host Plan of any Enrollee copayment liability. In most instances, BCBSM will calculate this liability based on the lower of the provider's billed charges or the negotiated rate BCBSM pays the Host Plan. This negotiated rate may represent either:

- the actual price paid on the claim, or

- an estimated price which reflects adjusted aggregate payments expected to result from settlements or other non-claims transactions between the Host Plan and all or a specified group of its health care providers, or

- a discount from billed charges representing the Host Plan's expected average savings for all or a specified group of its health care providers.

Host Plan using the last two methods may prospectively adjust such prices to correct for over-or underestimation of past prices.

A small number of states, by statute, require Host Plans to use a basis to calculate Enrollee copayments which does not reflect the entire savings to be realized or expected on a particular claim. If Enrollees receive services in one of these states, their copayment liability will be calculated using these statutory methods.

Enrollees will be advised of the amount of their copayment liability in the Explanation of Benefits Form for the claim.

E. Small Claims Applied to Deductibles and/or Copayments.

If the amount of an Enrollee Claim for Out-of Area Services is either totally or mostly absorbed by deductibles and/or copayments, so that little or no amount will be included in Amounts Billed, and the Host Plan's provider arrangements allows the negotiated payment rate to apply when the amount of the claim is fully or mostly the patient's obligation, BCBSM will pay the Host Plan an access fee, which will be included in Amounts Billed as a claims expense even though little or none of the claim was paid by the Host Plan.

## ARTICLE VII
## AGREEMENT, TERM, TERMINATION, AMENDMENT, AND LAW

A. Entire Agreement.

This Contract includes and incorporates any Schedules, Addenda, Exhibits, and Amendments and represents the entire understanding and agreement of the parties regarding matters contained herein, supersedes any prior agreements and understandings, oral or written, between the parties and shall be binding upon the parties, their successors or assigns.

B. Termination.

30009946544

1. Normal. Either party may with or without cause, upon the first (1st) day of the month following thirty (30) days written notice, terminate this Contract as to claims incurred after termination.

2. Nonpayment/Partial Payment. Notwithstanding any other Contract provisions, in the event that the Group fails to timely pay any amounts owed, BCBSM may, after five (5) days notice, terminate this Contract.

C. Amendment.

This Contract may be amended at any time, but only by written agreement duly executed only by authorized representatives of the parties.

D. Severability.

The invalidity or non-enforceability of any provision of the Contract shall not affect the validity or enforceability of any other provision of the Contract.

E. Waiver.

The waiver by a party of any breach of this Contract by the other party shall not constitute a waiver as to any subsequent breach.

F. Law.

This Contract is entered into in the State of Michigan and, unless preempted by federal law, will be construed according to the laws of Michigan.

**BCBSM:**

By: _Michelle Tellier_ (signature)

Name: _Michelle Tellier_ (print)

Title: _Sales Consultant_

Date: _5/16/03_

By: _____ (signature)

Name: _____ (print)

Title: _____

Date: _____

**GROUP:**

By: _Carroll Lanostka_ (signature)

Name: _CARROLL LANOSTKA_ (print)

Title: _SECRETARY_

Date: _5-15-03_

By: _Carroll Lanostka_ (signature)

Name: _CARROLL LANOSTKA_ (print)

Title: _SECRETARY_

Date: _5-15-03_

B105 MAY16'03AM 9:58

30009946544

14

ORIGINAL